UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BENITA R. ALVA, ) | |
| ) | |
| Plaintiff, ) | Case No. CV09-4153 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

Plaintiff filed her current benefits application in October 2004. She alleged that she had been disabled since May 2004 due to breast cancer and the side effects from radiation and chemotherapy. [Administrative Record ("AR") 360-362, 363-364]. In a February 23, 2007 written hearing decision that constitutes the Commissioner's final decision in this matter, an administrative law judge ("ALJ") found that plaintiff had the following impairments that were severe in combination: an adjustment order, depressed; questionable obesity; hypertension; hypercholesterolemia; and a history of breast cancer (status post partial

mastectomy on September 23, 2004 followed by chemotherapy and radiation ending on October 19, 2005). [AR 24]. The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work. The ALJ concluded that plaintiff was not disabled because her RFC did not preclude her from performing jobs existing in significant numbers in the national economy.[1] [JS 2-3; AR 21-32].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Changed circumstances**

By way of background, the court notes that the prior, final decision denying benefits bars reconsideration plaintiff's disability through July 3, 2002, the date of that prior decision. See Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995) (holding that res judicata barred reconsideration of claim for period with respect to which a final determination had already been made); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (noting that the principles of res judicata apply to administrative decisions). The prior adverse decision also creates a rebuttable presumption that plaintiff continued to be able to work after that date. See Lester, 81 F.3d at 827; Lyle v. Sec'y of Health & Human Servs., 700 F.2d 566, 567 (9th Cir. 1983).

---

[1] Plaintiff filed a prior application for benefits in May 2000. That application was denied by an ALJ in a final written hearing decision dated July 3, 2002.[JS 3; AR 21, 320-325].

1    The presumption of continuing nondisability may be overcome by a showing of "changed
2 circumstances," such as new facts establishing a previously unlitigated impairment. See Lester, 81 F.3d at
3 827-828; Chavez, 844 F.2d at 693.  In this case, the ALJ found that plaintiff had rebutted the presumption
4 by showing changed circumstances in the form of a new, medically determinable impairment, breast cancer,
5 which was diagnosed after the date of the prior adverse decision. [AR 22].  Accordingly, the ALJ did not
6 apply the presumption of continuing nondisability.

**Credibility finding**

8    Plaintiff's sole contention is that the ALJ failed to provide legally sufficient reasons for rejecting
9 the alleged severity of plaintiff's subjective complaints. [See JS 4-22].  More specifically, plaintiff argues
10 that the ALJ wrongly concluded that "the objective medical evidence did not support the level of limitation
11 [plaintiff] describes," and that her daily activities were inconsistent with disability. [JS 7].  Plaintiff also
12 contends that the ALJ's finding that plaintiff's symptoms from breast cancer and breast cancer treatment
13 did not persist for twelve consecutive months is not based on substantial evidence in the record. [JS 8-13].
14    Once a disability claimant produces evidence of an underlying physical or mental impairment that
15 is reasonably likely to be the source of his or her subjective symptoms, the adjudicator is required to
16 consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885
17 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§
18 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated).  Although the ALJ may
19 then disregard the subjective testimony he considers not credible, he must provide specific, convincing
20 reasons for doing so. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001); see also Moisa, 367 F.3d
21 at 885 (stating that in the absence of evidence of malingering, an ALJ may not dismiss the subjective
22 testimony of claimant without providing "clear and convincing reasons").  The ALJ's credibility findings
23 "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's
24 testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367
25 F.3d at 885; see Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (enumerating factors that
26 bear on the credibility of subjective complaints); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir.
27 1989)(same).  If the ALJ's assessment of the claimant's testimony is reasonable and is supported by
28 substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857

(9th Cir. 2001).

**Plaintiff's testimony**

In her disability reports, plaintiff asserted that she could not work due to the side effects of chemotherapy and radiation. She complained of extreme fatigue, weakness, nausea, soreness throughout her body, loss of appetite, a tingling sensation on her scalp, uncontrolled high blood pressure, drowsiness and blurred vision as side effects of her medications, and a rapid heartbeat. [AR 363-364, 373, 376-377].

Two administrative hearings were conducted in this case, the first in July 2006 [AR 813-820], and the second in October 2006. [AR 821-847]. Plaintiff was represented by counsel during both hearings, and she testified on her own behalf.  A different vocational expert testified at each hearing. [AR 818, 841].

Plaintiff was 52 years old at the time of the first hearing, and 53 years old at the time of the second hearing. [AR 815, 841].  She had a high-school diploma and attended college for about a year. [AR 814-815]. Plaintiff testified that she had last worked in 1996 or 1997.  Her last two jobs were part-time jobs, one in a stationery store and the other in a Christian bookstore. [AR 815-816].

Plaintiff testified that she was diagnosed with breast cancer in May 2004, which is the alleged date of onset of her disability. She said that she had been "extremely sick for about a month and a half" before she was diagnosed. [AR 825].  Plaintiff testified that she underwent a partial mastectomy or "lumpectomy" in September 2004. [AR 825]. She also testified that beginning in February 2005, she underwent six cycles of chemotherapy, receiving an infusion every three weeks. [AR 826-827].  Plaintiff said that early during the course of chemotherapy, she developed back pain that did not resolve when she finished chemotherapy and still bothered her. [AR 827-828].  Asked if she had other symptoms associated with chemotherapy, plaintiff said that she was nauseous, had "a really hard time sleeping," had feelings of paranoia, and "a lot of tingling . . . in my body." [AR 828]. The symptoms would strike "really hard in the beginning" after she received an infusion and then taper off as the date for the next infusion approached. [AR 828]. Chemotherapy was followed by radiation treatments, which hurt "like a really bad sunburn." [AR 828-829].

The ALJ mentioned a February 2006 report from plaintiff's treating oncologist, Dr. Vakil (whose name is spelled "Bakill" in the hearing transcripts), stating that plaintiff was "in remission," and that she was being monitored for evidence of metastasis. [AR 606-609, 668]. The ALJ asked plaintiff to describe her limitations beginning around the time Dr. Vakil diagnosed her as in remission.[AR 829; see AR 606-

4

609]. Plaintiff replied that she could not stand up for long periods of time because it hurt her back and legs. She said that she had constant aches all over her body that were like having the flu, a lot of tingling in her hands and feet, and that she could not sit for long without having to move on account of back pain. [AR 830]. Plaintiff acknowledged that she had undergone a recent PET scan and two x-rays that had revealed no abnormalities in her back. [AR 830]. She testified that she told one of her treating doctors that she slipped and hit her "tailbone" in the seventh grade, causing symptoms for weeks afterward, and her doctor said that "he thinks it could be that the radiation or the chemo irritated that injury because I can't bend over real good or . . . get out of the car right, stuff like that. Or go grocery shopping . . . my back, it's like somebody's pushing down on it. But they never found anything." [AR 831].

  Plaintiff testified that she had refused Dr. Vakil's offer to prescribe pain pills because she "used to be on drugs, but I've been clean for 16 years. And I didn't want to go back." [AR 831]. Asked if her doctor recommended alternative pain treatments such as acupuncture, physical therapy, or exercise, plaintiff said no, but that on her own she purchased a girdle that did little for her back pain. [AR 832].

  Plaintiff said that she had not undergone any additional breast cancer treatment since February 2006 other than taking the medication Arimidex, which was prescribed for a total of five years. [AR 832]. She said that she had hypertension for which she was taking prescribed medication, but sometimes her blood pressure was still high. She said that she was not on a special diet. She testified that she took two beta blocker medications for heart arrhythmias in addition to her anti-hypertensive medication. Plaintiff said that she still had episodes of heart arrhythmias, and that more episodes had occurred recently, for example in connection with her father's death. She added, however, that those episodes were not "full-blown like I used to have." [AR 833]. No doctor had told her that the arrhythmias were caused by an emotional impairment such as anxiety or grief. [AR 834].

  The ALJ mentioned that Dr. Vakil at one point reported that plaintiff was depressed. Plaintiff said that Dr. Vaikil had given her a medication to take if she was having trouble sleeping, but not for depression. Plaintiff said that she had received mental health treatment "way in the past," but that now she went to church. [AR 834].

  Plaintiff testified that she was on welfare when she was raising her son, worked for a little while, was married for a while, and then began receiving general relief when her son turned 18. [AR 834-836].

Asked if she had looked for work since her cancer's remission in February 2006, plaintiff said that the only job she knew was that of a cashier, and she could not do the standing involved in that job. During the day, plaintiff said, she spent her time sleeping, lying down, and watching television, but "I'm always having to move around." [AR 836]. Plaintiff said that she lived alone and could do household chores herself, but she did her laundry in the sink because it was hard to carry it down and up the stairs to and from her apartment. [AR 836-837].

Plaintiff said that she had problems reaching to scratch her back with her left arm, but that her main problem was pain and achiness in her bones and joints. [AR 837]. She said that she took her prescribed medication both in the morning and at night, and that the beta blockers (Toprol and Sotalol) made her drowsy. Plaintiff said that if she had to go to the store or do other tasks in the morning, she waited to take her pills until after she was done. [AR 838-840].

**The ALJ's analysis**

The ALJ concluded that plaintiff's subjective symptoms were less than fully credible. [AR 30]. The ALJ cited a lack of objective medical evidence corroborating plaintiff's subjective complaints, a treatment history he deemed inconsistent with her subjective allegations, discrepancies between plaintiff's testimony and her doctors' reports, plaintiff's daily activities, and her work history. [AR 25-29]. The ALJ accepted that plaintiff's breast cancer, chemotherapy, and radiation were severe, medically determinable impairments that produced subjective symptoms. However, his negative credibility assessment led him to conclude that plaintiff's symptoms associated with breast "did not persist for at least 12 consecutive months," and therefore that her breast cancer symptoms failed to meet the durational requirement for disability. [AR 27-28].

There is some merit to plaintiff's contentions that the ALJ did not properly evaluate her subjective complaints. For the reasons described below, the ALJ's credibility finding is *not* based on substantial evidence in the record as it relates the period beginning May 14, 2004, when plaintiff was first diagnosed with breast cancer and began undergoing the panoply of diagnostic procedures preceding treatment, through February 6, 2006, when her treating oncologist diagnosed plaintiff's cancer as in remission. Substantial evidence supports the ALJ's rejection of the alleged severity of plaintiff's subjective complaints with respect to the period after her diagnosis of remission (that is, February 7, 2006 through the date of the ALJ's

6

decision).

For example, the ALJ concluded that the objective medical evidence did not corroborate the alleged severity of plaintiff's subjective symptoms. [See AR 25-28]. Contrary to plaintiff's argument, a lack of supporting medical evidence is one factor, among others, that an ALJ properly may consider in assessing subjective symptoms. See Burch, 400 F.3d at 681. Therefore, the ALJ did not commit reversible error merely by considering the objective medical evidence, along with other evidence, in evaluating plaintiff's subjective symptoms. However, the record as a whole contains objective medical evidence contradicting the ALJ's finding that plaintiff's breast cancer and associated symptoms did not persist for twelve consecutive months.

Plaintiff's medical records reveal that between March 2004 and May 2004, shortly before her breast cancer diagnosis, she had multiple emergency room visits for complaints of chest pain, shortness of breath, palpitations, and other symptoms. She was hospitalized for four days during that period for "malignant hypertension." [AR 527-549, 552-585]. These objective medical records enhance plaintiff's overall credibility by substantiating her testimony that she was "extremely sick" in the month and a half preceding her diagnosis. [AR 825].

Plaintiff underwent a mammogram on May 14, 2004 that was "highly suggestive of malignancy" in the left breast. [AR 550]. In May and June 2004, plaintiff underwent breast tissue biopsy, and pathology studies were conducted that led to a diagnosis of stage I invasive ductal carcinoma. [AR 434, 547-550, 659-662, 669-674].

On June 23, 2004, plaintiff had a hematology consultation and was deemed a candidate for "wide excision with radiation therapy" and possible adjuvant chemotherapy. [AR 434-435]. On July 26, 2004, plaintiff had an oncology consultation and elected a lumpectomy with sentinel node excision. The oncologist noted that plaintiff's hypertension medication had been increased recently "due to high blood pressure and response to this new diagnosis [of cancer]." [AR 430].

During June, July, and August 2004, plaintiff continued to see her primary treating physician, Dr. Balacuit, about once a week, or once every two weeks at a minimum, for treatment of hypertension, headaches, and other issues. [AR 590-594]. In late July or early August 2004, plaintiff also saw her treating cardiologist for surgical clearance, preoperative blood tests, and a chest x-ray. [See AR 374, 430].

7

On August 4, 2004, plaintiff, "with newly diagnosed breast cancer," underwent a diagnostic whole body PET/CT scan "for staging," that is, to determine the degree to which the cancer may have metastasized. There was no evidence of metastases. [AR 521, 733-734].

On September 7, 2004, plaintiff had a mammogram and ultrasound of her right breast for a mass, which was declared "a probably benign nodule." [AR 731-732].

On September 23, 2004, plaintiff underwent a successful left partial mastectomy (lumpectomy) and sentinel lymph node dissection. Pathology studies showed negative margins and nodes, without evidence of metastatic carcinoma. [See AR 696-709, 718- 730, 742].

In October 2004, plaintiff's surgeon advised plaintiff to return to her oncologist for follow-up and to have a radiation oncology consultation. He stated that plaintiff should avoid trauma to the left arm. [AR 742]. Later that month, plaintiff was seen at UCLA Medical Center for a radiation oncology consultation and was advised to undergo radiation therapy. She told the attending physician that she hoped to receive radiation treatments closer to her home in Monrovia. [AR 393-394].

In January 2005, plaintiff saw Dr. Vakil for a chemotherapy evaluation. The sequence of medical events culminating in her referral for chemotherapy is not clear from the record. Dr. Vakil's initial consultation report noted that plaintiff had new problems in the form of nodular moles requiring additional diagnostic studies. Dr. Vakil ordered that plaintiff be screened for clinical trials, and if none were available, that she proceed with chemotherapy. [AR 440-442]. Plaintiff began chemotherapy in February 2005 and received her sixth and last infusion on May 20, 2005, slightly more than a year after her initial diagnosis. [AR 438, 522, 589, 808].

In August 2005, roughly three months after her last chemotherapy infusion, plaintiff began daily radiation therapy under the supervision of Dr. Moorhead. Plaintiff received radiation treatment through October 2005. [AR 487-525]. In December 2005, plaintiff underwent a skull-to-thigh PET scan for tumor imaging and an echocardiogram. The PET scan showed that the left breast and lymph nodes were clear. [AR 485-486].

Between December 2005 and July 2006, plaintiff saw Dr. Balacuit, her primary care doctor, numerous times for complaints of recurrent lower back pain, skin rash, hypertension, and hyperlipidemia. [AR 639-643]. She also saw her cardiologist for her history of cardiac arrhythmias (supraventricular

tachycardia). [AR 651-652, 667].

Plaintiff saw Dr. Vakil for follow-up oncology appointments in April 2005, May 2005, October 2005, January 2006, February 2006, March 2006 and February 2007. [AR 761-807]. In April 2005 Dr. Vakil noted that plaintiff had developed skin lesions. [AR 798]. In February 2006, Dr. Vakil diagnosed major depressive disorder, recurrent episode, unspecified degree and recommended a psychiatric referral and cancer support group. [AR 768-769]. He reaffirmed that diagnosis in March 2006 and February 2007.[AR 761-767].

Plaintiff had follow-up visits with Dr. Moorhead, her radiation provider, in May 2006 and February 2007. There was no clinical evidence of recurrence of cancer. Bilateral mammograms were negative. [AR 633-638, 659].

Contrary to the ALJ's reasoning, the objective medical evidence as a whole corroborates the severity and duration of plaintiff's cancer treatment and subjective symptoms from May 14, 2004 through February 6, 2006. For example, the ALJ drew a negative inference from plaintiff's testimony about her chemotherapy treatment. Plaintiff testified that she completed six cycles of chemotherapy at 21-day intervals, but the ALJ noted that a February 2005 treatment report from Dr. Vakil showing just one chemotherapy treatment "is the only evidence of" plaintiff's chemotherapy aside from her own statements and testimony. [AR 27; see AR 438]. Plaintiff submitted additional evidence to the Appeals Council, including a chemotherapy progress chart documenting six completed cycles of chemotherapy beginning on February 4, 2005 and ending on May 20, 2005. [AR 808]. In addition, Drs. Moorhead, Balacuit, and Vakil each unequivocally referred to plaintiff's having undergone chemotherapy in their notes. [See, e.g. AR 522 (August 2005 consultation note by Dr. Moorhead stating that plaintiff was "seen by Dr. Vakil and received 6 cycles of CMF chemotherapy, completed approximately 3 months ago.")]. That documentary evidence corroborates plaintiff's testimony about her chemotherapy and undermines the ALJ's suggestion that plaintiff's testimony was suspect, or at least was unsubstantiated by medical evidence.

The ALJ also discredited plaintiff's subjective allegations because "in January 2005, [plaintiff] reported no problems." [See AR 28 (citing AR 440 (Dr. Vakil's initial consultation report))]. In January 2005, however, plaintiff had not actually started chemotherapy or radiation, and therefore she had not yet experienced any of the side-effects from treatment she described. In his January 2005 initial examination

report, Dr. Vakil described plaintiff's post-surgical condition as only "fair," and he continued to assess her condition as "fair" during chemotherapy. [AR 442, 761-807]. On "Patient Care Monitor Reports" (essentially subjective history surveys) completed by plaintiff during follow-up visits with Dr. Vakil in January and February 2006, and with his associate, Dr. Upadhyaya, in February 2007, plaintiff complained of a variety of physical, functional, and psychological problems, which were rated relative to a "baseline" of July 22, 2005, after plaintiff completed chemotherapy but before she started radiation therapy. Plaintiff's reported psychological symptoms, aggregated as "distress" and "despair/depression," increased in January 2006 and February 2007 relative to the July 2005 baseline, as did her reported level of musculoskeletal pain, fatigue, weakness, daytime sleepiness, and physical functional limitations (including sitting, walking and daily activities). [See AR 764, 771, 773]. Therefore, the ALJ's reliance on plaintiff's condition in January 2005 to conclude that she did not meet the twelve-month durational requirement was misguided.

Dr. Moorhead supervised plaintiff's radiation therapy and monitored her response between August 2005 and December 2005. His progress notes document plaintiff's subjective complaints and limitations of chronic, constant low back pain, low energy levels (ranging from 50% to 60% of normal), limited activity, fatigue, heart palpitations, some shortness of breath on exertion, some pressure sensation in the chest when stressed, persistent dry cough, skin rashes and itchiness, occasional headache, and left breast pain and/or tenderness. [AR 487, 492, 498, 503, 508, 513, 519, 523]. In follow-up notes from May 2006 and February 2007, Dr. Moorhead reported that plaintiff's energy level was about 55% and activity was limited. [AR 633, 637]. Her mood was "down" in May 2006 and "pretty good under the circumstances" in February 2007. [AR 633, 637]. Plaintiff also complained of low back pain and pain in her joints. [AR 633, 637]. Dr. Moorhead's notes corroborate plaintiff's subjective complaints of back pain, fatigue, and significant symptom-related limitation in her ability to perform daily activities.

On February 6, 2006, about nine months after plaintiff completed chemotherapy and four months after her last radiation treatment, Dr. Vakil completed an RFC assessment form. [AR 606-609]. He gave plaintiff diagnoses of malignant neoplasm, breast, and major depressive affective disorder, recurrent episode. He said that plaintiff' "is in remission, however she is being monitored for evidence of liver or bone metastasis or electrolyte abnormalities. Her depressive disorder is active & ongoing." [AR 606]. Dr. Vakil said that plaintiff had breast pain at and around the surgical site and back pain, and that on a scale of

1 to 10, her "pain is 6-8 always." [AR 606]. He listed blood tests, CT scans, and x-rays as objective evidence of her condition. [AR 606]. Dr. Vakil noted that plaintiff was on a regimen of chemotherapy and radiation therapy that "caused nausea & vomiting - sleepiness, depression & lack of ability to manage pain is ongoing." [AR 606]. Dr. Vakil said that plaintiff's impairments had lasted or could be expected to last at least twelve consecutive months, and that plaintiff was not a malingerer. [AR 606-607]. He indicated that depression and anxiety were emotional factors contributing to the severity of plaintiff's symptoms and functional limitations, and that her physical and emotional impairments were reasonably consistent with the subjective symptoms and limitations described on the evaluation form. [AR 606]. Dr. Vakil opined that plaintiff's pain and other symptoms would frequently interfere with the attention and concentration needed to perform even simple tasks, and that plaintiff was incapable of even low stress jobs. He explained that plaintiff "is in nearly constant pain & her depression, pain & anxiety are not controlled." [AR 607]. Asked to describe plaintiff's limitations in sitting, standing, walking, lifting, carrying, engaging in postural activities, and manipulating objects, Dr. Vakil described a level of functional limitation that amounts to less than sedentary work. [AR 607-608]. He estimated that she would miss work more than four days a month. [AR 609]. As to described additional limitations, Dr. Vakil remarked that plaintiff had other health issues that plaintiff had not been able to deal with due to pain and depression, and he added that plaintiff "takes several medications, some of which can cause nausea and/or vomiting and sleepiness." [AR 609]. Plaintiff submitted a similar assessment form from Dr. Vakil dated April 5, 2007 to the Appeals Council. [AR 630-632].

The ALJ rejected Dr. Vakil's February 2006 assessment, and plaintiff does not specifically challenge the ALJ's rejection of that opinion as a whole. Plaintiff contends, however, that the ALJ improperly disregarded Dr. Vakil's statement that some of plaintiff's medications "can cause" side effects of nausea, vomiting, and sleepiness. [AR 609]. The ALJ concluded that Dr. Vakil's statement did not bolster the credibility of plaintiff's testimony because Dr. Vakil did not identify medications that caused side effects or say that plaintiff "actually experiences any side effects." [AR 29]. The ALJ also said that plaintiff's complaints of side effects are not "documented by the evidence." [AR 30].

The record establishes that Dr. Vakil was aware of the prescribed medications that plaintiff was taking in addition to chemotherapy, among them Toprol and Sotalol. [See, e.g., AR 769, 782]. Dr. Vakil said

11

that plaintiff suffered nausea and vomiting during chemotherapy and had ongoing problems with sleepiness, and that those symptoms can be caused by the medications plaintiff took. Those statements corroborate plaintiff's testimony that chemotherapy made her nauseous, and that taking Toprol and Sotalol made her drowsy. Dr. Vakil was not required to definitively determine the etiology of plaintiff's complaints of nausea or sleepiness in order for his testimony to amount to substantial evidence bolstering the credibility of plaintiff's own testimony about experiencing side effects from her medications.

The ALJ also disregarded Dr. Vakil's February 2006 assessment because there was "no evidence" that Dr. Vakil had seen plaintiff since February 4, 2005. [AR 30]. The ALJ noted that Dr. Vakil submitted a March 2006 lab report with his February 2006 assessment, but that report "did not document patient-physician contact." [AR 30]. Dr. Vakil stated on the assessment form itself that he had last seen plaintiff on February 6, 2006, one day before he signed the form. [AR 606]. Medical records submitted to the Appeals Council showed that plaintiff had seen Dr. Vakil for numerous follow-up appointments after February 2005, including visits on January 13, 2006 and February 6, 2006. [AR 768-777]. Thus, the inference that Dr. Vakil lacked contemporaneous personal knowledge of plaintiff's condition in February 2006 is contradicted by the record.

The ALJ further explained said that he gave "less weight" to Dr. Vakil's February 2006 assessment because Dr. Vakil's "description of [plaintiff's] response to chemotherapy and radiation is uncorroborated by the evidence." [AR 30]. That statement makes little sense. Dr. Vakil was the treating oncologist who prescribed chemotherapy and monitored plaintiff's response to it, and he saw plaintiff during and after her radiation therapy. Therefore, Dr. Vakil's clinical observations about plaintiff's response to chemotherapy and radiation are "evidence," and that evidence corroborates plaintiff's subjective testimony. In addition, Dr. Moorhead's description of plaintiff's condition during radiation therapy (energy levels at about half of normal, limited activities, pain and other subjective complaints) generally is consistent with plaintiff's subjective testimony about the same period of time.

Accordingly, the ALJ did not articulate specific, clear, and convincing reasons, supported by the record as a whole, for rejecting plaintiff's subjective complaints concerning her breast cancer diagnosis and treatment from May 14, 2004 through February 6, 2006, and therefore his finding that plaintiff's breast cancer symptoms did not persist for twelve consecutive months lacks substantial support in the record as

a whole. Considering the objective medical evidence and giving proper weight to plaintiff's subjective allegations, plaintiff is entitled to a closed period of disability beginning on May 14, 2004 through February 6, 2006, the date that Dr. Vakil declared her cancer to be in remission. That time period includes plaintiff's initial diagnosis; the post-diagnosis/pre-operative period, when plaintiff underwent a variety of medical procedures and tests to refine her diagnosis, determine the appropriate course of treatment, and prepare for surgery; surgery; chemotherapy; radiation; and a recovery period following each of those intensive treatment modalities, the last of which ended with Dr. Vakil's February 6, 2006 diagnosis of remission.

However, the testimonial and documentary evidence presents a significantly different portrait of plaintiff's condition *after* her diagnosis of remission. [See AR 829-840]. Other than taking Arimindiex, plaintiff did not receive additional treatment for breast cancer. [AR 832]. She had occasional, routine oncology follow-up appointments in May 2006 and February 2007 that were negative for evidence of cancer. [AR 633-638, 659, 761-767]. Dr. Vakil diagnosed her with major depression [AR 768-769], but plaintiff testified she did not take medication or seek any other treatment for that condition. [AR 833-834]. Plaintiff testified that she had back pain and body aches and complained about those symptoms to her doctors, who ordered diagnostic testing. Those tests had detected no medical abnormalities, however, and her doctors had prescribed no treatment for those conditions. Plaintiff admitted that she did not take medication or utilize alternative therapies for relief of those allegedly disabling symptoms. [AR 830-832]. She said that her blood pressure was "sometimes" high despite her anti-hypertensive medication, but there is no medical evidence that her hypertension was out of control or causing significant problems. Plaintiff sometimes still had arrhythmias, but she did not have "full-blown" episodes as in the past. [AR 833]. She testified that she lived along, drove, and could managed household chores herself. [AR 836]. Plaintiff said that had worked only "a little while," and she had a history of dependence on public assistance. [AR 834-835].

With respect to the period *after* February 6, 2006, the ALJ permissibly rejected plaintiff's "excess" subjective symptoms on the grounds that they were uncorroborated by objective medical evidence, at odds with plaintiff's minimal treatment history, inconsistent with her ability to live alone and perform activities of daily living, and because plaintiff worked only briefly and stopped working long before her alleged onset of disability, suggesting a "lack of commitment to work." [AR 29]. See Burch, 400 F.3d at 681 (concluding

that where the claimant's pain was "not severe enough to motivate her to seek" consistent treatment, her failure to do so was "powerful evidence regarding the extent to which she was in pain," and that the ALJ did not err in concluding that the claimant's ability to care for her own personal needs, cook, clean, shop, interact with others, and manage her finances "suggest[s] that she is quite functional"); Thomas, 278 F.3d at 953, 958-959 (holding that the ALJ did not err in factoring into his credibility analysis the claimant's "extremely poor work history" and her ability to live alone and perform chores such as cooking, laundry, washing dishes, and shopping); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998) (holding that the claimant's allegations of severe back impairment were contradicted by her daily activities, her use of nonprescription pain relievers, and by the lack of follow-up treatment); see also Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998)(explaining that a poor work history may support an inference that a claimant was unwilling to work rather than unable to do so); McGuire v. Apfel, 1999 WL 426035, at *11-*13 (D. Or. 1999) (holding that although the claimant's desire to avoid addiction was a valid reason for not taking narcotic medication, the ALJ did not err in concluding that the claimant's "lack of incentive in obtaining pain medication" belied his complaints of disabling pain).

**Remedy**

In general, the choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or for payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). A district court

> should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178).

As to the period from May 14, 2004 through February 6, 2006, the ALJ failed to provide legally sufficient reasons for rejecting plaintiff's allegedly disabling symptoms and functional limitations. The

vocational expert testified that a person with plaintiff's vocational profile who had the symptoms and functional limitations described in Dr. Vakil's February 2006 assessment would be disabled. [AR 843]. Therefore, it is clear that the ALJ would be required to find plaintiff disabled during that period if he properly assessed plaintiff's subjective allegations.  As to the period after February 6, 2006, the ALJ's decision is supported by substantial evidence and is free of legal error. Accordingly, a remand for an award of benefits for a closed period of disability is the appropriate remedy.  See Benecke, 379 F.3d at 595 (explaining that while "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation," the district court erred in remanding for further proceedings because "the record . . . clearly establishes that [the claimant] cannot perform a sedentary job or any other substantial gainful work that exists in the national economy . . . .")(quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).

**Conclusion**

For the foregoing reasons, the Commissioner's decision is affirmed in part and reversed in part, and the matter is remanded to the Commissioner for an award of benefits consistent with this memorandum of decision.

**IT IS SO ORDERED.**

August 13, 2010

_____
ANDREW J. WISTRICH
United States Magistrate Judge